**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BOUSTEAD SECURITIES, LLC,<br>SUTTER SECURITIES, INC., and<br>KEITH C. MOORE<br><br>Plaintiffs,<br><br>v.<br><br>FINANCIAL INDUSTRY<br>REGULATORY AUTHORITY, INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. |

**DECLARATION OF KEITH C. MOORE**

1. My name is Keith C. Moore. I am the former Chief Executive Officer of Plaintiffs Boustead Securities, LLC and Sutter Securities, Inc (the "**Companies**"). I remain on the Board of Directors of both companies.

2. Plaintiff Boustead Securities LLC ("**Boustead**") is an investment banking broker-dealer that provides financial advisory services to clients on mergers and acquisitions, capital raises, and restructuring, with the core of its business dedicated to serving as an underwriter for initial public offerings ("**IPOs**") on U.S.-based listing exchanges.

3. Plaintiff Sutter Securities, Inc. ("**Sutter**") is also an investment banking broker-dealer, providing similar financial advisory services as Boustead.

4. On January 15, 2026, FINRA's Department of Enforcement filed a Complaint naming the companies and myself as Respondents (the "**Enforcement Proceeding**"). The Complaint asserts causes of action under the federal securities laws and FINRA rules. As a result of the Enforcement Proceeding, I risk losing the ability to associate with a FINRA member firm, and the Companies risk losing the ability to do business as FINRA members.

5. The Enforcement Proceeding has subjected me to an unconstitutionally structured

decision-making process led by an illegitimate and unconstitutionally appointed decision maker. I am consequently suffering a here-and-now injury and irreparable harm.

6. Similarly, the Enforcement Proceeding has subjected the Companies to an unconstitutionally structured decision-making process led by an unconstitutionally appointed decision maker. The Companies have, and will continue to suffer, a here-and-now injury and irreparable harm.

7. There are numerous examples of the irreparable harm that FINRA's Enforcement Proceeding has caused and continues to cause. I will describe a few examples.

8. First, before FINRA filed its Complaint, the Companies submitted applications for limited underwriting membership applications ("**LUMA**") to the Nasdaq exchange to serve as underwriters for their clients' IPOs. After a lengthy process, both Companies' LUMA applications were initially denied by the Nasdaq. Approximately seven (7) months later, the Companies resubmitted their LUMA applications, and Sutter's LUMA application was approved. Boustead's was not.

9. When both Companies' LUMA applications were denied, FINRA admitted to the Companies that it interfered with the Companies' LUMA applications by advising the Nasdaq to deny the Companies' LUMA applications. FINRA told the Companies that it was directing the Nasdaq's membership department not to approve the Companies' LUMA applications because FINRA was in the process of initiating the Enforcement Proceeding, even though the underlying investigation leading to the Enforcement Proceeding ended approximately seven (7) months earlier.

10. After the Companies submitted their LUMA applications to the Nasdaq, the Companies submitted similar applications to become limited underwriting members of the New

York Stock Exchange (the "**NYSE**") to be able to underwrite their clients' IPOs on that exchange. Almost immediately after the Companies' LUMAs were submitted to the NYSE, the Companies were informed by the NYSE that, at the direction of FINRA, their LUMA applications would be denied unless withdrawn because FINRA was in the process of filing the Enforcement Proceeding. According to the NYSE, if the Companies wanted more information about how they could become LUMA members, they needed to discuss the matter with the FINRA Enforcement Department attorneys handling the Enforcement Proceeding.

11. Before and after FINRA filed the Complaint in the Enforcement Proceeding, Boustead executed agreements with its clients, where issuers agreed to engage Boustead and its affiliates (the Companies) to serve as underwriters for their IPOs. Since FINRA began its investigation that resulted in the Enforcement Proceeding, many of these issuers terminated their agreements with Boustead.

12. The issuers informed the Companies that they terminated their agreements because the Companies were not able to close on the issuer's IPOs. The reason the Companies could not close on these issuers' IPOs is because initially the Nasdaq was told by FINRA to not approve any potential IPOs for which Boustead was underwriter as a result of a "regulatory matter" involving Boustead. Then, when the Nasdaq and NYSE required limited underwriting membership in order to underwrite IPOs on those respective exchanges, the Nasdaq and the NYSE, respectively, rejected the Companies' LUMAs pursuant to FINRA's command. Specifically, the Nasdaq and NYSE rejected the Companies' LUMAs and barred them from serving as lead underwriter for IPOs on those exchanges, at the instruction of FINRA, because of the pending Enforcement Proceeding. It is my understanding that, absent FINRA's commands to the Nasdaq and the NYSE, the Companies would have been able to underwrite their clients' IPOs before limited underwriting

membership was required and they also would have become members of the Nasdaq and NYSE, would have been approved to act as lead underwriters for Nasdaq and NYSE IPOs, and would have closed on all of their pending IPOs for their issuer clients.

13. The Companies' clients continue to terminate agreements with the Companies based on their inability to obtain LUMA membership in the Nasdaq and the NYSE. For example, just this year, one of Boustead's clients terminated its agreement with Boustead to underwrite its IPO on the Nasdaq exchange based on Boustead's inability to become a Nasdaq member.

14. The Companies have suffered, and continue to suffer, additional and irreparable harm that I directly attribute to the Complaint that FINRA filed on January 15, 2026.

15. For example, on or about March 10, 2026, Sutter was informed that, at the insistence of its clearing firm, Sutter's clearing agreement was being terminated. In explaining its decision, the clearing firm stated that the termination was because of FINRA's Enforcement Proceeding.

16. Even more recently, on or about March 19, 2026, the Companies' principals, including myself, were informed by Dominari Securities, LLC ("**Dominari**"), that our personal brokerage accounts, or brokerage accounts in the names of limited liability companies for which we are managers or managing members, were closed at the demand of Dominari's clearing firms, RBC and Wedbush. It is my understanding that RBC and Wedbush are FINRA-regulated entities.

17. Dominari's representative informed me (and other Dominari representatives informed others affiliated with the Companies) that they disagreed with the decision to close the personal brokerage accounts but had "no choice" but to close the accounts.

18. Dominari's representative further informed me that the accounts were being closed explicitly because they were informed by Dominari's clearing firms that the Companies were

named in FINRA's Complaint filed on January 15, 2026. Dominari's representatives stated that they learned of the Enforcement Proceeding based on a letter Dominari received from the House Select Committee on China that referenced the Companies and the Enforcement Proceeding.

19. Daniel McClory, who is also a principal of the Companies and a member of Sutter's Board of Directors, is the other person who had his brokerage accounts closed by Dominari because of the Enforcement Proceeding.

20. In addition to my and Mr. McClory's brokerage accounts, another company and client of Boustead's had its account closed at Dominari because I am the manager of that company. This closure implicated several investors that are not affiliated with the Companies as owners, officers, directors, employees, contractors or registered representatives, but instead are only investors.

21. It is my sincere belief that FINRA is doing everything possible to expel the Companies from FINRA, Nasdaq and NYSE membership and in doing so, expelling the Companies from the securities industry without any due process, government intervention, or oversight whatsoever. As a result of FINRA's Enforcement Proceeding, the Companies are not able to continue its main line of business, namely serving as lead underwriter in its clients' IPOs on the Nasdaq and NYSE, one of the Companies' clearing firm relationships has been terminated, and the Companies' principals and clients are unable to engage in trading activity as a result of their brokerage accounts being closed.

22. I am over eighteen years of age. I am fully capable of making this declaration. The following is within my personal knowledge and is true and correct.

*The remainder of this page is intentionally left blank*

Pursuant to 28 U.S.C. § 1746, I, Keith C. Moore, declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated this 1st day of April, 2026.

Keith C. Moore